MASSIGH STALLMANN,   )
          )
  Petitioner,    )
          )
  vs.       )   Case No. 4:13-CV-1646-CEJ
          )
TROY STEELE,     )
          )
  Respondent.   )

## MEMORANDUM AND ORDER

This matter is before the Court on the petition of Massigh Stallmann for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed a response in opposition. Petitioner has replied, and the issues are fully briefed.

### I. Background

#### A. The Crimes

On April 20, 2005, Brenda Buschmann was asleep in her apartment above the Schaeperkoetter General Store in Mount Sterling, Missouri. Buschmann awoke just after midnight to see petitioner "poke his head out of her bathroom." *State v. Stallman*, 289 S.W.3d 776, 777 (Mo. Ct. App. 2009). Petitioner "came into the bedroom, pointed a gun at her, and demanded keys to her vehicle." *Id.* Buschmann gave petitioner the keys to her car, a silver Mazda Protégé. Petitioner was dressed in camouflage clothing and was wearing a ball cap. *Id.* He told Buschmann that he had cut her phone line. *Id.*

Petitioner then walked downstairs to the general store. *Id.* Buschmann used her cellular phone to call 911. *Id.* Meanwhile, petitioner used the keys to open Buschmann's car; he started the vehicle and drove it around to the front of the

store. Resp. Ex. A-2 at 179–80. Leaving the Mazda running with the driver's side door ajar, petitioner entered the store after apparently breaking in through a glass door. *Id.* at 225. Buschmann described hearing noises coming from the store below. *Stallman*, 289 S.W.3d at 777. The police would later discover that money and "other items were taken from the store," that "the safe in the office was opened," and that "the alarm wire" had been "cut." *Id.*

In response to Buschmann's 911 call, law enforcement officers were dispatched to the store, where they anticipated finding "an armed robbery in progress." *Id.* Deputy Harold Heitman arrived on scene and radioed to request the support of additional officers. Resp. Ex. A-2 at 226. Though the storefront was dark, from his vantage point in the parking lot in front of the store he could see a person walking around inside, aiming a lit flashlight around the store. *Id.* at 226–28. He testified to seeing petitioner holding a gun. *Id.* at 226.

Officer Brian Brennan arrived shortly after Heitman. *Id.* at 300–02. According to Brennan, the area outside the store where he and Heitman were standing was bathed in "a lot of light" from "a sign" at "the business next to it that lights up the entire parking lot pretty" well. *Id.* at 303–04. Standing in the lit parking lot in front of the glass storefront, Heitman was in a "full Class A" police "uniform." *Id.* at 269.

Though Heitman did not recall "saying anything" to petitioner before petitioner fired the gun, *id.* at 233, Brennan testified that he heard Heitman yell, "drop the weapon, drop the weapon," and afterward "heard a gunshot from inside the store." *Id.* at 303. According to Heitman, shortly after he saw petitioner holding the gun, petitioner turned around and took "a look," after which he

"[r]aised his weapon," aimed it at Heitman, "and then fired." *Id.* at 227. A 12-guage shotgun, a piece of "shotgun wadding," and a spent shotgun shell were later recovered from the scene. [Docs. ##6-2 at 2–5, 6-5 at 7]

Brennan testified: "After" Heitman "yelled drop the weapon, drop the weapon, and I heard the gunshot from the side of the store, that's when Deputy Heitman shot into the store." Resp. Ex. A-2 at 304, 324–25. Heitman continued to return fire while utilizing his flashlight to attempt to see into the darkened storefront. *Id.* at 227–28. After he was "fired upon," Heitman also announced that he was a police officer. *Id.* at 267.

Officer Paul Owensby arrived on scene minutes later. *Id.* at 231–32. The officers fired their weapons into the store. *Id.* During the firefight, Heitman was accidentally "struck in the face with a bullet," *Stallman*, 289 S.W.3d at 777, later revealed to have been fired by Owensby. Resp. Ex. A-2 at 272–73. After Heitman was shot and lying on the ground, petitioner exited the store. *Id.* at 231–32. According to Heitman, at the time petitioner exited the storefront his face was uncovered, and Heitman had an unobstructed view of petitioner's face. *Id.* Heitman testified that petitioner is the man who shot at him. *Id.*

Upon exiting the store, petitioner "dropped his weapon, jumped in Buschmann's Protégé, and drove away." *Stallman*, 289 S.W.3d at 777. Owensby got in his police car and set off in pursuit of petitioner, while Brennan radioed for medical support and tended to Heitman. Resp. Ex. A-2 at 306, 337. Owensby caught up with petitioner, activated his police vehicle's lights and sirens, and engaged petitioner in a high-speed chase, at times reaching speeds of "at least 95

miles an hour." *Id.* at 340–41. Owensby also radioed for additional police assistance. *Id.* Other officers joined the pursuit. *Id.* at 342–43.

The car chase ended in Franklin County, Missouri, where petitioner "fled the car, which caught on fire." *Stallman*, 289 S.W.3d at 777. "A SWAT team was called out to set up a perimeter and conduct a manhunt. A camouflage ball cap was found fifteen to twenty feet from the burned car." *Id.* Missouri Highway Patrol Trooper Robert Wolf testified that the Franklin County Sheriff's Office requested the Highway Patrol engage the SWAT team to assist them in the "manhunt" for petitioner, who "had fled into the woods." Resp. Ex. A-2 at 690–92, 699.

The Highway Patrol's communications team then paged members of the SWAT team to respond from their various locations throughout that area of Missouri. *Id.* at 692–93. The SWAT team established a staging area for the manhunt at a church in Leslie, Missouri, and SWAT team members were directed to proceed there to assist with the manhunt for petitioner. *Id.* at 693. According to Wolf, when the members of the SWAT team are paged, they are to "respond just as quickly as they can." *Id.* at 695.

"Trooper Ralph Tatoian . . . was a member of the SWAT team who was called to respond to the manhunt." *Stallman*, 289 S.W.3d at 777. Tatoian was first paged and then called at home by Highway Patrol radio operator Kevin Turnbough, at 3:36 a.m. Resp. Ex. A-2 at 708. Turnbough informed Tatoian that the SWAT team was being activated to "respond to" a call arising from "shots fired at deputies," an "armed robbery," and "a stolen vehicle." *Id.* He was also told "the suspect fled" and "more shots" had been "fired." *Id.* Turnbough directed Tatoian to proceed to the staging area in Leslie. *Id.*

Tatoian confirmed he would "be en route just shortly." *Id.* at 709. Wolf testified that in such an "active manhunt" situation, a SWAT team member's vehicle lights and sirens would be activated. *Id.* at 699–700. SWAT team members are trained to, and "have to," drive at high speeds "every day" while "exercising care in doing so." *Id.* at 704. A SWAT team member in Tatoian's circumstances would be expected to drive at whatever speed "the car is capable of" and "whatever the conditions allow for" to reach the intended destination "just as fast as" the trooper "possibly can." *Id.* at 699–701. Thus, Tatoian would "be expected" to exceed the speed limit while responding to the call to assist with the manhunt. *Id.* at 700.

At 4:35 a.m., Turnbough requested a status check from Tatoian, who responded that he was en route to Leslie via Interstate 44. *Id.* at 710. According to Wolf, Interstate 44 was the "most direct route to" Leslie "from where" Tatoian lived. *Id.* at 698–99. At 4:43 a.m., Turnbough was notified of an accident on Interstate 44, which he later learned involved Tatoian. *Id.* at 710–11, 720–21.

Proceeding at high speed in the left lane on Interstate 44 and with his vehicle's lights and sirens activated, as he was trained to do, *id.* at 735–36, Tatoian "passed a crash site. A car entering a construction zone had lost control and hit the concrete wall on the right, rotated and came to rest in the left lane facing the wrong way." *Stallman*, 289 S.W.3d at 777. Tatoian moved to the right lane to avoid the crash, and then moved back to the left lane after he passed the accident. Resp. Ex. A-2 at 710–11, 720–21. He also simultaneously crested a hill, immediately on the other side of which was a tractor-trailer that had stopped in the left lane. *Id.* at 736.

According to investigators, Tatoian had insufficient time and distance to bring his police car to a stop before colliding with the tractor-trailer. *Id.* at 736–37. Striking the trailer at high speed, Tatoian's vehicle slid partially under the trailer, the impact of which killed him instantly. *Id.*; *Stallman*, 289 S.W.3d at 777–78. Shortly after 6:00 a.m., the manhunt ended when petitioner was apprehended after being chased down in a field. *Stallman*, 289 S.W.3d at 777–78; Resp. Ex. A-2 at 415.

## B.     The Indictment and the Pre-Trial Proceedings

Petitioner was charged with ten crimes: (I) first-degree robbery, Mo. Rev. Stat. § 569.020; (II) second-degree burglary of the store, *id.* § 569.170; (III) stealing Buschmann's vehicle, *id.* § 570.030; (IV) stealing from the store, *id.*; (V) second-degree assault of a law enforcement officer, *id.* § 565.082.1(1)[1]; (VI) resisting arrest, *id.* § 575.150; (VII) armed criminal action, for committing Count I with a deadly weapon, *id.* § 571.015; (VIII) armed criminal action, for committing Count V with a deadly weapon, *id.*; (IX) first-degree burglary of Buschmann's apartment, *id.* § 569.160; and (X) second-degree murder, for Tatoian's death, *id.* § 565.021.  Resp. Ex. B at 9–14.

In Missouri, "[a] person commits the crime of assault of a law enforcement officer . . . in the second degree if such person . . . [k]nowingly causes or attempts to cause physical injury to a law enforcement officer . . . by means of a deadly weapon or dangerous instrument."   Mo. Rev. Stat. § 565.082.1(1).   The State alleged that, "on or about April 20, 2005, in the County of Gasconade, State of

---

[1]All citations are to the statutes in force on April 20, 2005, which were accurately reproduced in the charging documents and in the jury instructions.  Further, statutory amendments that went into effect after indictment but before trial do not bear on the specific provisions under review here.

Missouri, Harold Heitman[] was a law enforcement officer, the defendant knew Harold Heitman was a law enforcement officer, and attempted to cause physical injury to him, by means of a deadly weapon."  Resp. Ex. B at 10.

"A person commits the crime of murder in the second degree" in Missouri if that person, "[c]ommits or attempts to commit any felony, and, . . . in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the . . . immediate flight from the perpetration of such felony or attempted perpetration of such felony."  Mo. Rev. Stat. § 565.021.1(2).  The State alleged that:

> [O]n or about April 20, 2005 . . . Trooper Ralph Tatoian . . . was killed in a motor vehicle accident while responding to a call to assist in the apprehension of a suspect at large as a result of the immediate flight from the perpetration of the class B felony of assault of a law enforcement officer in the second degree . . . committed by the defendant on April 20, 2005 . . . .

Resp. Ex. B at 11.

As relevant here, petitioner was represented by Jessica Hoskins during the pre-trial phase of his prosecution.  Hoskins solicited the aid of an intern from the state public defender's office, who had access to petitioner's defense files. Unbeknownst to Hoskins at the time, the intern "had previously been employed as a" deputy police officer and "had worked the initial investigation" of petitioner's case; he was also identified as a potential witness for the prosecution.  Resp. Ex. F at 31.  When petitioner first raised that issue to Hoskins, she inquired, but the intern denied that he had worked on the investigation.  Hoskins investigated the matter.  When the intern was presented with evidence documenting his involvement, he admitted he had participated in the investigation.  The intern was immediately removed from petitioner's defense team.

Hoskins did not move to dismiss the charges. Rather, she filed a motion to place a "gag order" on the intern. On February 16, 2006, the trial court issued that gag order, forbidding the intern from discussing petitioner's "case unless counsel for" petitioner was "present." Resp. Ex. B at 25. The trial court also ordered that, if petitioner's counsel objected to any question posed to or statement made by the intern, he was to "desist from answering" any "question or making" any "statement" until ordered to answer by the court. *Id.* Though petitioner speculates otherwise, no evidence of record suggests the intern violated the gag order or that the intern communicated privileged information to the prosecution or its witnesses before the gag order was in place.

Additionally, on June 6, 2006, Hoskins moved to exclude the intern from the prosecution's witness list, preventing him from testifying at trial. *Id.* at 33–36. The trial court granted that motion. *Id.* at 19. Finally, Hoskins was replaced as petitioner's counsel for trial by Robert Taaffe.

### C. The Trial and Sentencing

For three days beginning on July 17, 2007, a jury trial was held on the charges. Resp. Ex. A-2. The evidence as described in the background section above was presented to the jury at trial. *See id.* After the prosecution rested its case, Taaffe moved for a judgment of acquittal. *Id.* at 732. That motion was denied, and the defense proceeded with its witnesses. *Id.* At the close of the defense's case, Taaffe again moved for a judgment of acquittal, arguing, *inter alia*, that "all counts" were "insufficient as a matter of law to submit to the jury." *Id.* at 742. The motion was again denied. *Id.* at 747. During closing arguments, Taaffe moved for a mistrial, and that motion was denied. *Id.* at 804.

The pertinent jury instruction mandated that, to convict petitioner of second-degree assault of a law enforcement officer, among other things, the jury was required to find beyond a reasonable doubt that petitioner "knew Harold Heitman was a law enforcement officer" when he shot at Heitman. Resp. Ex. B at 49. Likewise, to convict petitioner of second-degree murder, *inter alia*, the jury was required to find beyond a reasonable doubt that Tatoian was "traveling to participate in a man hunt for" petitioner "following the assault of a law enforcement officer," and that Tatoian was "killed as a result of the immediate flight from the perpetration of that assault of a law enforcement officer." *Id.* at 54. The jury returned a unanimous verdict of guilty on all charges. *Id.* at 66, 71; Resp. Ex. A-2 at 811–12.

On August 13, 2007, Taaffe filed a motion for acquittal or, in the alternative, for a new trial. Resp. Ex. B at 22, 72–73. The trial court denied that motion. *Id.* at 22. A sentencing hearing was held on November 27, 2007. Resp. Ex. A-3. Petitioner was sentenced to consecutive terms of life imprisonment and fifteen years of imprisonment, to be served concurrently with two sentences of thirty years, five sentences of ten years, and one sentence of five years. Resp. Ex. B at 74–80. Judgment was entered at the close of the hearing, and petitioner was remanded to the custody of the Missouri Department of Corrections. *Id.* He is confined at the Potosi Correctional Center in Potosi, Missouri. [Doc. #1]

### D. The Direct Appeal and Post-Conviction Motion

Petitioner filed a direct appeal of the jury's verdict, asserting, among other grounds for relief, "that the trial court erred in overruling his motion for judgment of acquittal of the second-degree felony murder charge because the State did not

prove beyond a reasonable doubt that" petitioner's "act of shooting Heitman was the proximate cause of Tatoian's fatal automobile accident." *Stallman*, 289 S.W.3d at 778. On June 2, 2009, the Missouri Court of Appeals affirmed. *Id.* at 780. Petitioner did not move to transfer the appeal to the Supreme Court of Missouri.

On November 23, 2009, petitioner filed a motion for post-conviction relief, pursuant to Mo. Sup. Ct. R. 29.15. As relevant here, petitioner argued that Hoskins was "ineffective for her failure to recognize" the intern, that she "should have filed a motion to dismiss the case," and that, "because counsel failed to file a motion to dismiss, his 'defense had been unfixably damaged'" by the intern. Resp. Ex. F at 30–34 (quoting petitioner's motion for post-conviction relief). Petitioner also argued that Taaffe was ineffective for failing to move for acquittal as to the charge of assault on a law enforcement officer. *Id.* at 32. A hearing was held on the motion; petitioner was represented by new counsel. On February 28, 2012, the post-conviction court denied the motion. *Id.* at 30–34.

Petitioner appealed the denial of the Rule 29.15 motion to the Missouri Court of Appeals. The sole ground for relief petitioner raised[2] in that appeal was that Taaffe was ineffective when he "failed to file a motion for acquittal at the close of trial on the charge of assault of a law enforcement officer." Resp. Ex. J at 3–4. On March 7, 2013, the Missouri Court of Appeals affirmed in an unpublished, non-precedential opinion. *Stallman v. State*, 391 S.W.3d 912 (Mo. Ct. App. 2013). However, the Missouri Court of Appeals provided to the parties a memorandum explaining its reasons for affirming. Resp. Ex. J. Petitioner did not move to

---

[2]Petitioner attempted to raise other claims in a *pro se* filing. The Missouri Court of Appeals did not accept the filing because he was represented by counsel. The rejected *pro se* filing is the gravamen of petitioner's argument against procedural default, which is mooted by reaching the merits here.

transfer that appeal to the Supreme Court of Missouri.  He timely filed the instant petition on August 6, 2013.  [Doc. #1]

## II.  Exhaustion and Procedural Default

Petitioner raised each claim he presents here in at least one state proceeding.  Respondent contends the failure to exhaust or procedural default may bar federal review of one or more of those claims.  "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).  Likewise, "[a]lthough the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated."  *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999).  Hence, where a court "can dispose of" all of a petitioner's "claims on the merits," it need "not address the issue of procedural default."  *Dodge v. Robinson*, 625 F.3d 1014, 1017 n.1 (8th Cir. 2010) (citing *Barrett*, 169 F.3d at 1162).  Here, whether petitioner's claims are fully exhausted or procedurally defaulted is a more complicated question than reaching the merits of his claims, which are easily resolvable against him.  The Court therefore does not discuss the procedural challenges and instead addresses the merits.

## III.  Legal Standard

Each of petitioner's claims was reviewed on the merits and rejected by at least one state court.  *See Johnson v. Williams*, 133 S. Ct. 1088 (2013); *Harrington v. Richter*, 562 U.S. 86 (2011); *Williams v. Roper*, 695 F.3d 825, 830 (8th Cir. 2012) (conducting deferential review where a petitioner's habeas claims were

reviewed on the merits by any level of state court). When a claim has been adjudicated on the merits in a state court proceeding, habeas relief is available under the Antiterrorism and Effective Death Penalty Act (AEDPA) only if the state court's determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision on the merits of a petitioner's claim is "contrary to" clearly established law if "it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005). "The state court need not cite or even be aware of the governing Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Brown v. Luebbers*, 371 F.3d 458, 461 (8th Cir. 2004) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)). "In the 'contrary to' analysis of the state court's decision, [the federal court's] focus is on the result and any reasoning that the court may have given; the absence of reasoning is not a barrier to a denial of relief." *Id.* A federal court "must determine what arguments or theories could have supported the state court's decision, and then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." *Dansby v. Hobbs*, 766 F.3d 809, 832 (8th

Cir. 2014) (quotation marks, bracketing, and citation omitted).

A decision involves an "unreasonable application" of clearly established law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular" petitioner's case. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see Payton*, 544 U.S. at 141 (explaining the application must be "objectively unreasonable"). An "unreasonable application" also occurs "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 406. But "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410. "Federal habeas relief is warranted only when the refusal was 'objectively unreasonable,' not when it was merely erroneous or incorrect." *Carter v. Kemna*, 255 F.3d 589, 592 (8th Cir. 2001) (quoting *Williams*, 529 U.S. at 410–11).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A petitioner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. Further, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Id.* at 101 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122

(2009)).  "[T]he views of the federal courts of appeals do not bind" a state court "when it decides a federal constitutional question, and disagreeing with the lower federal courts is not the same as ignoring federal law."  *Williams*, 133 S. Ct. at 1098.  In turn, "evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Yarborough*, 541 U.S. at 664.

Finally, "in reviewing the state court decision, a fact determination is presumed to be correct and must be rebutted by clear and convincing evidence."  *King v. Kemna*, 266 F.3d 816, 822 (8th Cir. 2001) (en banc); *see* 28 U.S.C. § 2254(e)(1); *Bell v. Norris*, 586 F.3d 624, 630 (8th Cir. 2009).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Richter*, 562 U.S. at 102.  A state court's decision may be considered an unreasonable determination of the facts based on the "evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), "only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record."  *Ryan v. Clarke*, 387 F.3d 785, 791 (8th Cir. 2004).  A federal court reviewing a state court's factual findings also must "defer to the credibility determinations" of the state court.  *Kennedy v. Kemna*, 666 F.3d 472, 484 (8th Cir. 2012).  When a federal court grants habeas corpus relief on the basis of § 2254(d)(2), it is obligated to explain "the reasoning which led it to conclude that the state finding was not fairly supported by the record."  *Sumner v. Mata*, 449 U.S. 539, 551 (1981).

## IV. Discussion

Petitioner raises three grounds for relief: (1) the prosecution failed to adduce sufficient evidence for a reasonable jury to conclude that petitioner's assault on Heitman was the proximate cause of Tatoian's death, and thus to convict petitioner of second-degree felony murder;  (2) Taaffe was ineffective for moving for acquittal at trial and for filing a post-trial motion for acquittal but not arguing in either instance that the evidence was insufficient for a reasonable jury to convict petitioner of second-degree assault of a law enforcement officer; and (3) Hoskins was ineffective for "failing to notice" the intern had investigated petitioner's case while still employed as a police officer and for failing to file a motion to dismiss the charges, because his defense was "unfixably damaged" by the intern's presence on his defense team.  Affording the direct appeal and post-conviction courts' denials of those claims on the merits due deference, 28 U.S.C. § 2254(d), the Court addresses each claim in turn.

### A.  Ground One

Petitioner first alleges that the prosecution failed to meet its burden to prove beyond a reasonable doubt that he committed the crime of second-degree felony murder, such that insufficient evidence supports the jury's verdict.  He specifically argues that no reasonable jury examining the evidence presented could have concluded his felony of second-degree assault of a law enforcement officer was the proximate cause of Tatoian's death.  He also challenges having been sentenced for that conviction, though he only argues the conviction was error, not the sentence itself, which compels a single analysis.

When a habeas petitioner challenges his conviction of a crime based on the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  It is "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id.*  "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'"  *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (quoting *Jackson*, 443 U.S. at 319); *see United States v. Whitlow*, 815 F.3d 430, 435 (8th Cir. 2016) (explaining that reviewing courts do "not reweigh the evidence or assess the credibility of witnesses" (citation omitted)).

Once a habeas petitioner "has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution."  *Jackson*, 443 U.S. at 319.  "Under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law."  *Coleman*, 132 S. Ct. at 2064 (quoting *Jackson*, 433 U.S. at 324 n.16, internal citation omitted).  But that Due Process inquiry is a narrow one where the "jury in this case was convinced," because "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality."  *Id.* at 2065; *see*

*United States v. Manning*, 738 F.3d 937, 944–45 (8th Cir. 2014) (rejecting a sufficiency of the evidence challenge to a jury's determination that a defendant had "knowingly" committed an element of the charged offense).

Further, when "the federal courts review a state-court ruling under the constraints imposed by AEDPA, the federal court must accord an additional and independent, high standard of deference." *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (quotation marks and citation omitted). Under that "twice-deferential standard" of review, a "state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (quotation marks and citation omitted); *see Nash v. Russell*, 807 F.3d 892, 897 (8th Cir. 2015) (applying *Jackson*'s "narrow standard of review," explaining that, under AEDPA, a court "may grant relief only if [it] find[s] the [state court's] conclusion that the evidence satisfied the *Jackson* sufficiency of the evidence standard both incorrect and unreasonable," and rejecting a habeas challenge to the sufficiency of the evidence (quotation marks and citation omitted)).

On direct appeal, petitioner argued that the evidence was insufficient to convict him of second-degree felony murder. As he does here, petitioner claimed that the evidence was not sufficient for a reasonable jury to have determined that his second-degree assault of Heitman was the proximate cause of Tatoian's death. The Missouri Court of Appeals rejected that claim and affirmed. *Stallman*, 289 S.W.3d at 778–80.

The Missouri Court of Appeals identified the sufficiency of the evidence issue and applied case law derived from *Jackson* to determine that question:

When reviewing the sufficiency of the evidence, we consider the evidence and all reasonable inferences reasonably drawn therefrom in the light most favorable to the verdict, and disregard all evidence and inferences to the contrary. In reviewing a challenge to the sufficiency of the evidence, our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.

*Id.* at 778 (citations omitted); *see Jackson*, 443 U.S. at 319 (same).

Next, the Missouri Court of Appeals explained that, in Missouri, "[a] person is guilty of second-degree murder if he commits any felony and, in the perpetration of that felony, another person is killed as a result of the perpetration of that felony." *Stallman*, 289 S.W.3d at 779 (citing Mo. Rev. Stat. § 565.021.1(2) and *O'Neal v. State*, 236 S.W.3d 91, 96 (Mo. Ct. App. 2007)). "Missouri follows the foreseeability-proximate cause theory of felony murder in interpreting whether a death resulted from the perpetration of a felony." *Id.* (citing *O'Neal*, 236 S.W.3d at 96). "Under that theory, the identity of the actual killer is irrelevant and a defendant may be considered responsible for any deaths that are the natural and proximate result of the commission of a felony." *Id.* (citing *O'Neal*, 236 S.W.3d at 96). A defendant's "'unlawful act need not be the immediate cause of death. It is enough that it be a contributing proximate cause, although other contributing causes may have intervened.'" *Id.* (quoting *State v. Black*, 50 S.W.3d 778, 785 (Mo. 2001) (en banc)). Further, "contributory negligence" is "not a viable defense, because a wrongdoer does not 'escape liability for a criminal act because another event concurs to produce the prohibited consequence.'" *Id.* (quoting *State v. Kliegel*, 674 S.W.2d 64, 66 (Mo. Ct. App. 1984)).

Applying those rules to the facts, the Missouri Court of Appeals determined a reasonable jury could conclude Tatoian's death was proximately caused by

petitioner's assault on Heitman:

> Tatoian was killed while responding to a call to assist in apprehending [petitioner], who was at large, armed and dangerous, after [petitioner]'s immediate flight from his assault on Heitman. It is reasonably foreseeable that an armed robbery, ensuing assault on a police officer responding to the robbery, and flight therefrom would meet resistance and cause a pursuit and manhunt, and that these crimes would set into motion the chain of events that caused Tatoian's death.

> \* \* \*

> [I]t was [petitioner's] running from the scene of the crime that prompted the manhunt for him in which Tatoian was involved when he crashed. Furthermore, the stopped tractor-trailer into which Tatoian crashed was not an intervening cause of Tatoian's death.

> \* \* \*

> Tatoian was killed as a result of participating in law enforcement's attempt to apprehend [petitioner] during his immediate flight after committing the felony. . . . The immediacy of [petitioner's] flight from the felony of assault of a law enforcement officer required the summons of additional officers to apprehend [him]. It was foreseeable that these other officers would have to respond to the area of [petitioner's] flight *as quickly as possible* and as such, endangering their lives. [Petitioner] created this peril to their lives by his immediate flight and the danger he posed, which responding officers needed to quickly contain.

*Id.* at 779–80. Consequently, the Missouri Court of Appeals held, "Tatoian's death was a reasonably foreseeable consequence of" petitioner's "actions, and therefore he can be held criminally liable for Tatoian's death under Missouri's proximate cause theory of felony murder . . . ." *Id.* at 780.

The Missouri Court of Appeals correctly identified *Jackson* as the controlling precedent for petitioner's claim. *See* 28 U.S.C. § 2254(d)(1). The appellate court also faithfully applied that legal standard, explaining in detail why a reasonable jury could have concluded beyond a reasonable doubt that petitioner's assault on Heitman was the proximate cause of Tatoian's death. *See id.* The application of

Missouri's proximate cause rule of felony murder to the facts here raises no Due Process concerns. *See Coleman*, 132 S. Ct. at 2064–65. As detailed above, the state appellate court's opinion is in full accord with the evidence introduced at trial and from which the jury rendered its decision, and is therefore not an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). Therefore, petitioner is not entitled to relief on this claim. *See id.* § 2254(d).

## B. Ground Two

Petitioner next contends Taaffe was ineffective for moving for acquittal at trial and for filing a post-trial motion for acquittal but failing to raise in either instance that the evidence was insufficient for a reasonable jury to convict petitioner of second-degree assault of a law enforcement officer.

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the first *Strickland* prong, there exists a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance. *Id.* at 689. Thus, "counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," and the "burden to show that counsel's performance was deficient rests squarely on the defendant." *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (quotation marks and citation omitted). A reviewing court must refrain "from engaging in hindsight or second-guessing of trial

counsel's strategic decisions." *Abernathy v. Hobbs*, 748 F.3d 813, 816 (8th Cir. 2014) (citation omitted).

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Merely showing a conceivable effect is not enough; a reasonable probability is one sufficient to undermine confidence in the outcome." *Paulson v. Newton Corr. Facility*, 773 F.3d 901, 904 (8th Cir. 2014) (citation omitted). Although *Strickland* requires a showing of both deficient performance and prejudice, a "finding that no prejudice exists is sufficient to conclude that counsel was not constitutionally ineffective—[courts] need not first make a determination regarding deficiency." *Holder v. United States*, 721 F.3d 979, 987 (8th Cir. 2013).

"Taken together, AEDPA and *Strickland* establish a 'doubly deferential standard' of review." *Williams*, 695 F.3d at 831 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011)).

> First, under *Strickland*, the state court must make a predictive judgment about the effect of the alleged deficiencies of counsel on the outcome of the trial, focusing on whether it is "reasonably likely" that the result would have been different absent the errors. *Strickland*, 466 U.S. at 696. . . . To satisfy *Strickland*, the likelihood of a different result must be "substantial, not just conceivable." *Id.* Under AEDPA, [federal courts] must then give substantial deference to the state court's predictive judgment. So long as the state court's decision was not "contrary to" clearly established law, the remaining question under the "unreasonable application" clause of § 2254(d) is whether the state court's determination under the *Strickland* standard is unreasonable, not merely whether it is incorrect. [*Richter*, 562 U.S. at 101]. This standard was meant to be difficult to meet, and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* [at 102].

*Williams*, 695 F.3d at 831–32.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

Regarding the motion for acquittal during the trial, Taaffe moved for acquittal on "all counts" at the close of the defense's case, arguing "all counts" were "insufficient as a matter of law to submit to the jury."  Resp. Ex. A-2 at 742.  As the post-conviction court explained, the claim that Taaffe should have moved for acquittal on the charge of second-degree assault on a law enforcement officer is "refuted by the record and must fail."  Resp. Ex. F at 32.  Affirming that determination, the Missouri Court of Appeals agreed that petitioner's claim was "refuted by the record because trial counsel made a motion for judgment of acquittal as to all counts at the close of all evidence . . . ."  Resp. Ex. J at 4. Counsel of course is not deficient or ultimately ineffective for allegedly failing to do the very thing he did.  *See Strickland*, 466 U.S. at 687.  That determination is fully supported by the factual record and is thus not unreasonable, mandating denial of relief.  *See* 28 U.S.C. § 2254(d); *Richter*, 562 U.S. at 105.

Further, no prejudice exists with respect to the allegation that Taaffe was ineffective for failing to raise a sufficiency of the evidence argument regarding the conviction for second-degree assault on a law enforcement officer in the post-trial motion for acquittal.  Reviewing that claim, the Missouri Court of Appeals cited and applied *Strickland*'s requirement that to succeed on such a claim, petitioner would have to show prejudice.  Resp. Ex. J at 4.  The Missouri Court of Appeals held petitioner could not show prejudice because, applying the Missouri case law that

derives from *Jackson*, 443 U.S. at 319, a "reasonable juror might have found" petitioner guilty of second-degree assault on a law enforcement officer "beyond a reasonable doubt." Resp. Ex. J at 4.

Indeed, the appellate court reviewed the trial evidence and explicitly found it sufficient for the jury to conclude that petitioner had "acted knowingly as to whether" Heitman "was a law enforcement officer." *Id.* at 5. As discussed above, Heitman was dispatched to the store for an "armed robbery in progress." *Id.* He "arrived on the scene in a marked patrol car" and was "wearing his full law enforcement uniform" when he "approached the store with his gun and flashlight drawn and saw" petitioner "inside the store holding a firearm." *Id.* Heitman testified he believed petitioner "saw him approaching" because petitioner then "fired at Heitman from inside the store." *Id.* Brennan also "testified that he heard Heitman yell, 'Drop your weapon, drop your weapon' before hearing the first gunshot." *Id.* Because "Heitman could see" petitioner "inside the store, the jury could reasonably infer that" petitioner "could see that Heitman was wearing a law enforcement uniform and had his gun and flashlight drawn." *Id.* Further, because petitioner "was in the" process "of committing a crime, a reasonable inference exists that" petitioner "knew that the person yelling 'drop your weapon' was an officer responding to investigate his illegal actions." *Id.*

"From this evidence," the Missouri Court of Appeals held, "the jury could reasonably infer that" petitioner "was aware that Heitman was a law enforcement officer when" petitioner "shot at him." *Id.* "Sufficient evidence exists," the state appellate court further held, "such that a reasonable juror could have found" petitioner "guilty beyond a reasonable doubt of second-degree assault of a law

enforcement officer." *Id.* at 6.  Consequently, petitioner "failed to show the result of the trial would have been different had trial counsel raised a specific allegation in his motion for judgment of acquittal regarding the sufficiency of the evidence" on "the charge of second-degree assault of a law enforcement officer," such that he "cannot show he was prejudiced by trial counsel's error." *Id.*  The appellate court affirmed. *Id.*

The state appellate court's discussion of this claim leaves no doubt it correctly identified and applied *Strickland* to the ineffective assistance of counsel claim, and correctly identified and applied *Jackson* to determine whether petitioner could show prejudice.  *See* 28 U.S.C. § 2254(d)(1).  The decision is also amply supported by the factual record, and is not an "unreasonable determination of the facts in light of the evidence presented." *Id.* § 2254(d)(2).  On this evidence, a reasonable jury could determine beyond a reasonable doubt that petitioner knew Heitman was a law enforcement officer when petitioner shot at him, and thus could convict petitioner of second-degree assault of a law enforcement officer, as the jury did.  Consequently, the Missouri Court of Appeals' determinations were not unreasonable and therefore must stand, barring relief on this claim.  *See id.* § 2254(d); *Richter*, 562 U.S. at 105.

### C.   Ground Three

Petitioner last alleges that Hoskins was ineffective for "failing to notice" the intern had investigated petitioner's case while still employed as a police officer and for failing to file a motion to dismiss the charges, because his defense was "unfixably damaged" by the intern's presence on his defense team.  Hoskins was replaced by Taaffe before trial.  Petitioner does not argue the attorney substitution

or the timing thereof prejudiced him, only that Hoskins was ineffective during the pre-trial phase of the proceedings.

As explained above, to prevail on an ineffective assistance of counsel claim, petitioner must show the attorney's performance fell below an objective standard of reasonableness and that he was prejudiced thereby. *Strickland*, 466 U.S. at 687. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Regardless of whether an attorney's performance was deficient, the failure to establish prejudice is dispositive. *Holder*, 721 F.3d at 987. Under AEDPA's "doubly deferential standard of review," *Williams*, 695 F.3d at 831, the "question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

In the state post-conviction court, petitioner raised the same issues regarding Hoskins that he raises here. As to petitioner's claim that Hoskins was "ineffective for failure to recognize" the intern, the state post-conviction court explained that petitioner's claim was "refuted by the court record." Resp. Ex. F at 31. Hoskins filed a motion to exclude the intern from the prosecution's witness list, and that motion was granted. *Id.* Therefore, the post-conviction court found, Hoskins was not ineffective because the concerns about the intern were revealed before trial. *See id.* Petitioner also alleged that Hoskins was ineffective for failing to file a motion to dismiss all of the charges. *See id.* Precisely as he asserts here, petitioner argued that, "because counsel failed to file a motion to dismiss, his 'defense had been unfixably damaged'" by the intern. *Id.* (quoting petitioner's Rule 29.15 motion). There, as here, petitioner did not explain or offer any evidence

showing how his defense was "unfixably damaged" by the intern's presence on his defense team. *See id.* As the post-conviction court explained: "[Petitioner] does not say how or why this is so. It is difficult to fathom how [petitioner] could have been harmed since [the intern] was prohibited from testifying." *Id.*

First, petitioner's claim fails because both here and in the post-conviction court he did not allege specific facts even suggesting prejudice, only conjecture. *See Dansby*, 766 F.3d at 823 (explaining that a "petitioner must present *both* the *factual and legal* premises of his claims to the state courts" (quotation marks and citations omitted)). Petitioner suggests that the intern was permitted to access his defense files, but he does not say what harm resulted. He also contends the intern remained friends with and spoke to police officers who were prosecution witnesses. Even assuming that is true, petitioner does not allege the intern had access to specific information that damaged his defense and that the prosecution did not possess, nor that the intern provided any such information to the prosecution or its witnesses. Petitioner's conclusory allegations here and in the post-conviction court mean the denial of this claim for failure to show prejudice was reasonable. *See Richter*, 562 U.S. at 105.

Second, in any event, the post-conviction court's analysis leaves no doubt it correctly identified and applied *Strickland* to the claims regarding Hoskins, and the post-conviction court's description and analysis of the facts was reasonable. On this record, regardless of whether Hoskins was ineffective, petitioner suffered no prejudice as a result because the trial was not affected. The post-conviction court highlighted the trial court's considerable efforts during the pre-trial proceedings to insulate the forthcoming trial from any error: the intern was removed from the

defense team, he was barred from testifying, a gag order was placed on him, and Hoskins was replaced by Taaffe. No evidence presented here or in the post-conviction court suggests the intern violated the gag order. If Hoskins had also filed a motion to dismiss the charges, no reasonable probability exists that such a drastic remedy would have been granted given the other prophylactic measures the trial court ordered. Therefore, because the post-conviction court's determination that petitioner has not shown prejudice was reasonable, petitioner is not entitled to relief on his claims with respect to Hoskins. *See* 28 U.S.C. § 2254(d); *Richter*, 562 U.S. at 105.

## V. Conclusion

For the reasons discussed above, the Court concludes that the petition for a writ of habeas corpus does not raise any issue entitling petitioner to relief, and the petition will be denied. 28 U.S.C. § 2254(d). Additionally, because petitioner has failed to make a substantial showing of the denial of a constitutional right, the Court will not issue a certificate of appealability. *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997).

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 12th day of September, 2016.